UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ALAMEDA, | No. 2:20-cv-01101 JAM GGH |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| M. ATCHLEY, | |
| Respondent. | |

*Introduction and Summary*

  Petitioner, a state prisoner proceeding pro se, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter was referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 626(b)(1) and Local Rule 302(c).

  Petitioner was one of two defendants charged with a gangland style execution and convicted of same. The victim was chosen as a result of an argument he had with the two defendants after a playground "stare-down", a seeming capital offense in some quarters. Petitioner was sentenced to life imprisonment without the possibility of parole. The issues here revolve around the admission of conversations of a jailhouse informant (Rhodes) with petitioner's co-defendant (Villa); Rhodes was in jail on charges unrelated to defendants' charges. Petitioner

////

1

also raises issues regarding severance, the lack of a voluntary manslaughter instruction, a claim of ineffective assistance of appellate counsel, and finally cumulative error.

After an exhaustive review of all issues and applicable law, the undersigned recommends that the habeas petition be denied.

*Background Facts*

The California Court of Appeal, Third Appellate District ("Court of Appeal") adequately set forth the basic background facts of this case. That rendition will be repeated here at length. Facts related to the specific issues will be given in those sections discussing the issues.

**FACTS**

*Brandishing and shooting*

At approximately 4:00 p.m., January 17, 2013, Villa and Almeda approached three boys who were playing basketball at a park. They stood at the court and stared at the boys. An angry conversation ensued, and defendants displayed guns in their waistbands. Almeda pulled out his gun and held it at his side.

After the argument, defendants walked to an older model red car. Almeda pulled a gun out of the car. He entered the car on the driver's side, and Villa entered it on the passenger side. They drove away. No one else was with them.

At approximately 5:00 p.m. the same day, Alex Chavez and his girlfriend, Jacqueline Jones, left Chavez's home in a white Chevrolet Suburban. They went to the home of Jones's father, about a five-minute drive, where Jones told him she was pregnant.

From there, they drove to a nearby market, where Chavez purchased a bottle of beer. Then they began driving back to Chavez's home, with Chavez holding the beer bottle as he drove.

At a stop sign, Jones was looking out the passenger window when she heard the sound of a bottle breaking. She looked at Chavez, and saw out the window another car on the driver's side. Looking into the car, she saw Almeda in the driver's seat, looking at Chavez. She thought she saw two other people in the car, one in the front passenger seat and another in the backseat on the passenger side.

Then she heard gunshots. Chavez told her to get down, and he pushed her down towards the floor. She went blank for a moment. When she awoke, the Suburban was moving forward slowly. Chavez was holding her hand. Then she heard two more shots. One of them hit Chavez in the head. His blood splattered all over her.

After Chavez was hit, his foot stepped on the gas pedal, and the car accelerated quickly. Jones climbed onto Chavez and stepped on the

2

brake pedal, stopping the car. She looked out the window and saw Almeda in the driver's seat of his car slowly driving by and looking at the Suburban. She also saw a man in the passenger side. Then the car sped off.

Jones tried to revive Chavez, but he was unresponsive. The bullet struck Chavez at the top of his neck where it met the head. It transected his spinal cord. He likely died within a few minutes after being hit.

Jones's sister, Nicole, arrived at the scene, and Jones told her Almeda shot Chavez. When the sheriff's deputies arrived, Jones told them Almeda shot Chavez, and she showed them where Almeda lived. Later that evening at the sheriff's department, she told a friend by text message that Almeda shot Chavez.

When Jones met with detectives that night, she told them she thought Almeda shot Chavez, but she was not sure. She knew Almeda shot Chavez, but she was emotional and in shock, and she was not comfortable with the detectives and how they "came at" her. She also did not want to be called a snitch and she was worried about the safety of her family.

A few days later, Chavez's sister, Laura, showed Jones a picture of someone on Facebook, and Jones recognized the person as one of the other persons in the car that shot at her and Chavez. Laura told her the person was Villa. Jones cried when she saw Villa's and Almeda's pictures. Laura also showed Jones a picture of Isaiah Almeda, defendant Michael Almeda's brother, on Facebook. Jones thought Isaiah was the third person in the car. Jones informed the detectives of Villa's and Isaiah's identities.

*Investigation*

Law enforcement collected evidence at the scene. They collected several .40-caliber shell casings. Four of those casings were fired from the same gun. Four bullet holes were found in the body of the Suburban. Police recovered a .40-caliber bullet fragment and a .38-caliber bullet fragment from inside the Suburban. The .40-caliber bullet fragment found in the Suburban and the .40-caliber bullet recovered from Chavez's body during an autopsy were likely fired from the same gun. The .38-caliber bullet could not have been fired from a .40-caliber weapon. It was most common to .38 special and .357 magnum ammunition.

Sheriff's deputies detained Isaiah the night of the shooting in a green Toyota Camry. Gunshot residue was found inside the Camry. That finding indicated either a weapon was fired near the vehicle or something contaminated with gunshot residue touched the vehicle.

Law enforcement searched Almeda's home. They discovered two live rounds (nine-millimeter and 7.62-caliber) and an expended shell casing (.357-caliber) in Isaiah's room.

[…]

3

**Other evidence**

### 1. *Prior encounter between Chavez, Jones, and defendants*

In December 2012, the month prior to Chavez's murder, Chavez and Jones encountered Villa and Almeda at a 7-Eleven store. Chavez and Jones were in the Suburban, and, as Chavez was backing up, Villa looked at Chavez and lifted his shirt like he was pretending he had a gun. He and Almeda got into a car. Jones did not know who the two were at the time. Chavez identified Almeda to her, but he did not know the other person.

Defendants followed Chavez as he drove to his home. Chavez sped up, but Almeda and Villa came up beside him. Seated in the passenger seat, Villa was smiling and flipping off Chavez and Jones with both hands. It appeared to Jones that Almeda was trying to hit them with his car. Defendants turned away as the two cars drove closer to Chavez's house. Chavez and Jones did not call the police to report the incident.

### 2. *January 16, 2013 shootout*

On January 16, 2013, the day before Chavez's murder, Sacramento police responded to a report of shots fired. They found multiple spent casings, both .40- and .45-caliber, on different corners of a street intersection. Six of these .40-caliber casings were fired from the same gun that fired the four .40-caliber casings recovered from the Chavez murder scene the next day.

In an interview on January 23, 2013, while in custody, Villa admitted he was involved in the January 16 shootout, but he said he was the victim. At the time of the interview, Villa had just been released from the hospital, and he "vehemently" expressed his desire to talk about an incident where he was the victim. At first he claimed his car had been set on fire by a group of men. When challenged by detectives, he changed his story and said he had been involved in a shooting. While he was driving his mother's "HHR/PT Cruiser-type" car, an SUV pulled up behind him and people in the car started shooting at him. He returned fire. He said he used a Beretta nine-millimeter gun. At first he said he did not pick up his casings and did not use a brass catcher. When police told him only .40- and .45-caliber ammunition was found, Villa said he had a brass catcher on his gun.

His mother's car sustained numerous gunshots, so he parked it in his family's driveway and covered it with a tarp. Two days later, he drove it to an alleyway and attempted to burn it. The car exploded or the fire blew him back, burning his face.

### 3. *Destruction of red car*

Almeda's father, also named Michael Almeda, sometimes helped a man who rented part of an auto body shop from John Cazares. Cazares knew Almeda was connected to a mid-90's Lumina or Corsica. The car was "beige/red" and "oxidized." Sometime in

4

> 2013, Cazares came back from a trip and saw Michael Almeda (defendant's father) and another person cutting up that car in the shop.
>
> **4. *Uncharged offense***
>
> On September 3, 2009, Villa pointed a gun out the driver's side of his vehicle and shot at a truck driven by William Klaus. Klaus's passenger sustained multiple injuries that were consistent with a shotgun blast or a pellet gun. Villa pleaded no contest and was convicted of shooting at an occupied vehicle. (Pen. Code, § 246.)

People v. Almeda, 19 Cal. App. 5th 346, 349-354 (2018).

*Issues Presented*

Statement of the issues is significant in this case, in that petitioner has not proceeded with all issues he raised in the California courts. Also, the undersigned has rearranged the order of issues such that it makes more sense. The issues presented are as follows:

1. The Admission of Rhodes' Statements Relayed by a Jailhouse Informant Violated Petitioner's Bruton Protections;

Petitioner has declined to raise as an issue, as he did in state court, that his Massiah[1] rights were violated. This could be because petitioner lacks standing to raise the constitutional rights of his co-defendant Villa. The co-defendant was the person giving incriminating statements to a jailhouse informant (Rhodes)—petitioner was not directly involved in statement giving although some of Villa's statements inculpated petitioner.[2] Or, it could be that petitioner cannot mount an AEDPA satisfying factual opposition to the trial court's findings, upheld on appeal, that the incriminating statements were not given to a government inspired informant.

////

---

[1] Massiah v. United States, 377 U.S. 201 (1964). In Massiah, the Supreme Court held that once the right to counsel attached to a defendant, the government could not put that defendant in a situation where the government created a situation likely to induce the defendant to give incriminating evidence in the absence of *that* defendant's counsel, e.g. by planting a government informant to elicit information from the defendant.

[2] See Shimon v. United States, 352 F.2d 449, 451-452 (D.C. Cir. 1965). See also Rakas v. Illinois, 439 U.S. 128, 134-135 (1978) (Fourth Amendment rights may not be vicariously asserted); United States v. Le Pera, 443 F.2d 810, 812 (1971) (defendant lacked standing to assert co-conspirator's Fifth Amendment rights not to incriminate himself); United States v. Partin, 601 F.2d 1000, 1006 (9th Cir. 1976) abrogated on other grounds United States v. Rewald, 889 F.2d 836 (9th Cir. 1989).

Petitioner briefs only the Bruton aspects of Villa's statements. Therefore, the undersigned will not review the state court's Massiah rulings except insofar as the facts related pertinent to whether the jailhouse informant's statements would be found "testimonial."

    2. <u>The Trial Court Erred in Denying the Severance Motion</u>;

    3. <u>The Trial Court Erred in Denying a Voluntary Manslaughter Instruction</u>;

    4. <u>Ineffective Assistance of Counsel for Failure to Argue the Introduction of False Testimony</u>; and

    5. <u>Cumulative Error</u>

*The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") Standards*

Petitioner must do more than demonstrate "error;" he must demonstrate error so egregious that it could not be said that jurists of fair mind would make such an error.

For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. <u>Thompson v. Runnels</u>, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing <u>Greene v. Fisher</u>, 565 U.S. 34, 39 (2011)); <u>Stanley v. Cullen</u>, 633 F.3d 852, 859 (9th Cir. 2011) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 405-406 (2000)). Circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." <u>Marshall v. Rodgers</u>, 569 U.S. 58, 63-64 (2013) (citing <u>Parker v. Matthews</u>, 567 U.S. 37, 48 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. <u>Id.</u>

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. <u>Price v. Vincent</u>, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003); <u>Chia v. Cambra</u>, 360 F.3d 997, 1002 (9th Cir. 2004). In this

regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, supra, 529 U.S. at 412. See also Lockyer, supra, 538 U.S. at 75 (it is "not enough that a federal habeas court, 'in its independent review of the legal question,' is left with a 'firm conviction' that the state court was 'erroneous.' ") "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103.

The undersigned also finds that the same deference is paid to the factual determinations of state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination. A petitioner must show clearly and convincingly that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338 (2006).

*Discussion*

1. The Admission of Rhodes' Statements Relayed by a Jailhouse Informant Violated Petitioner's Bruton Protections

In a nutshell, petitioner presents the identical factual and legal argument which was presented on direct review in the state courts. As correctly found by the Court of Appeal,

////

petitioner's argument is an anachronistic, pre-<u>Crawford</u> interpretation of <u>Bruton</u>. Petitioner's argument fails here as well.

The undersigned starts with the lengthy factual recitation by the Court of Appeal. Although this recitation was made with respect to petitioner's co-defendant's <u>Massiah</u> claim, the pertinent "Confrontation Clause" facts for the <u>Bruton</u> claim are identical.

> Sacramento County Deputy Sheriff Marcos Camacho was working in jail intelligence at the time. He testified the jail intelligence unit does not ask inmates to provide information on other inmates. It also does not have any official informants. If an inmate offers to share information, unit personnel will take down the information and forward it to the detective handling the case. The unit does not keep files or written reports of any such contacts by inmates.
>
> Deputy Camacho contacted the prosecutor after Rhodes asked to speak with jail personnel. Rhodes wanted to provide information about Villa. He also wanted to cut a deal and get a reduction in his sentence. Rhodes told Deputy Camacho he knew everything about Villa's case, but he would not give any details to Deputy Camacho.
>
> Deputy Camacho never approached Rhodes or asked him to provide information on Villa. Deputy Camacho never interviewed Rhodes to find out the information he had on Villa. He was not involved in obtaining any further information from Rhodes, nor did he participate in any interviews with Rhodes. He made no promises to Rhodes that he would get a deal in his case or offer him a deal if he would provide information.
>
> Deputy Camacho said there was no effort made by jail intelligence personnel to insure Rhodes and Villa continued to live in the same cell. He had no knowledge that anyone choreographed Rhodes's and Villa's cell movements to keep them together as cellmates. He also said it was common for cellmates to move together to different cells.
>
> Rhodes became an inmate at the Sacramento County Jail on May 10, 2012. He testified in the section 402 hearing that the first time he met Villa was when they were made cellmates, about 16 months after he entered the jail. About four months later, Rhodes contacted the jail deputies and told them he had some information on Villa's case. No one at the jail contacted him and asked for information in exchange for a reduction in his sentence.
>
> Rhodes testified he did not prompt Villa to talk. They "just talked. Just basic gossip talking." Villa "opened up" to him. Sometimes the two would "just look out the window and just start talking about certain things, and then it detoured back to the case." Until this incident, Rhodes had never provided information to law enforcement.
>
> Rhodes met with the prosecutor and her investigator on August 29,

8

2013. He asked them if he could get a reduced sentence. They entered into a so-called "queen-for-a-day" agreement, agreeing that nothing Rhodes said would be disclosed unless he waived disclosure by subsequent contract, provided exonerating or mitigating information, or provided information about threats to persons law enforcement had a duty to inform. This agreement expressly stated that no other promises or agreements were entered into at that time.

At the end of the meeting, the prosecutor explained the interview was confidential. She would talk with Rhodes's counsel, but no reports or disclosures would be made unless they eventually agreed to a contract with him. She said after counsel talked with each other, they would "see where we go from here."

Rhodes asked if there was anything else they wanted him to ask Villa. The prosecutor said, "No." The investigator said if Villa volunteered anything, Rhodes could listen like he had done. But the prosecutor told him, "Don't try and pry. If he tells you something that's fine, but, you know, I don't want to get you in a situation where you have any issues with him." After this first meeting with the prosecutor and investigator, Rhodes did not know if there would be a second meeting.

Through his attorney, Rhodes signed a subsequent "contract," i.e., a plea agreement, on November 4, 2013, that included the possibility of a reduced sentence. The prosecution agreed to move to reduce his sentence if he was asked to testify against Villa and was determined to have testified truthfully and cooperated fully. The plea agreement did not direct Rhodes to do anything regarding his contacts with Villa.

Rhodes met with the prosecutor and her investigator a second time on November 7, 2013, and relayed more information. He had not asked Villa any questions based on a request from the prosecutor or the investigator. According to the meeting's transcript, the prosecutor and the investigator did not give Rhodes any type of assignment or request him to ask Villa more questions or get more information.

The prosecutor's investigator met with Rhodes a third time on January 20, 2014, while transporting him. Again, the investigator did not ask Rhodes to get more information from Villa.

Neither Villa nor Almeda argued at trial to exclude the first *statement* Rhodes gave to the prosecutor and the investigator under Massiah. They did, however, seek to exclude his second and third statements under *Massiah*.

The trial court denied the *Massiah* motion. It ruled neither Villa nor Almeda had presented evidence showing Rhodes acted under the direction of the government pursuant to an existing agreement. Deputy Camacho did nothing to indicate there was an agreement with Rhodes or to suggest or ask Rhodes to get more information from Villa. Deputy Camacho did not put the two men in the same

9

> cell to get information from Villa.
>
> The court concluded the prosecutor and the investigator did not direct Rhodes's actions. In the first meeting, they listened. There was not even a trace in the transcript suggesting they were directing or telling Rhodes what to say. And, responding to Rhodes's question of whether there was something they wanted him to ask Villa, the prosecutor told him there was not. They told him to listen, not to pry, and not to get in a situation where he might get hurt. They ended the interview without extending any promise to him. In the second and third meetings, they did not suggest or ask Rhodes to do anything.
>
> The court saw no evidence "that would even remotely suggest that the government was involved in any way in directing him to do anything." None of the evidence suggested the court could infer the parties even thought there was an ongoing agreement to gather incriminating information.

People v. Almeda, supra, 19 Cal. App. 5th at 356-358.

The Court of Appeal then went on to analyze why Massiah error did not occur. The undersigned completely agrees with the analysis, but it is unnecessary to repeat it here since Massiah error is not at issue.

The applicability of both Massiah and Bruton totally depends (now) on whether the statements made to the jailhouse informant would be considered "testimonial." In the absence of testimonial statements, the rule of Bruton, which forbids blanket admission of a co-defendant's confessions/admissions implicating a defendant because of an inability of the defendant to cross-examine his co-defendant, is not applicable.

> *Bruton* established that in joint criminal trials, the introduction of "powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant," but who does not testify, violates the defendant's Sixth Amendment right to confront the witnesses against him. 391 U.S. at 135–36, 88 S.Ct. 1620. "The unreliability of such evidence is intolerably compounded when the alleged accomplice ... does not testify and cannot be tested by cross-examination." *Id*. at 136, 88 S.Ct. 1620; *see also Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). After *Bruton*, *Crawford* [v. *Washington*, 541 U.S. 36 (2004) added a new layer to Sixth Amendment analysis—that the Amendment's Confrontation Clause right attaches only as to "testimonial statements." 541 U.S. at 68, 124 S.Ct. 1354.
>
> We conclude that because the codefendant statement at issue here

> was nontestimonial and so not within the Confrontation Clause's protection under *Crawford*, *the Bruton protections concerning the introduction of statements by non-testifying codefendants do not apply*.

Lucero v. Holland, 902 F.3d 979, 983-984 (9th Cir. 2018) (emphasis added).

See also People v. Almeda, 19 Cal. App. 5th at 362 ("Bruton is simply irrelevant in the context of nontestimonial statements' made 'to a cellmate in an informal setting.'") (internal quotations and citations omitted).

By simply attaching his state appellate brief, petitioner goes no distance in demonstrating the facts found by the trial court and the Court of Appeal, regarding the non-testimonial nature of Villa's statements were error, much less AEDPA unreasonable error. Petitioner makes the same error he did in the Court of Appeal by relying on the abrogated "reliability of hearsay" rule citing Lilly v. Virginia, 527 U.S. 116 (1999). Petitioner relies on trial evidence/testimony to assert that because Villa's hearsay was "unreliable," admission of such violated the rule of Bruton. See ECF No. 4 at 4, 11-21. As held by the Court of Appeal, and the referenced federal cases above, the argument is inoperative.

Because the facts regarding the non-testimonial nature of Villa's statements to Rhodes are undisputed here, petitioner's Bruton claim should be denied.[3]

2. The Trial Court Erred in Denying the Severance Motion

Petitioner believes that his trial should have been severed from co-defendant's Villa's because of the Bruton issue, and because prior, unlawful misconduct evidence, i.e., Villa's propensity to fire weapons at other vehicles, was introduced at the joint trial.

But as the above discussion sets forth, petitioner did not have a Bruton issue because his co-defendant's statements to informant Rhodes were non-testimonial. That is, petitioner is in no better position to complain about Rhode's statements from a Confrontation Clause standpoint

////

---

[3] A large part of the claimed error in state court proceedings included both defendants' assertions that Villa's statements did not meet the hearsay exception of declaration against penal interest. However, whether the statements did meet the exception or not, is a matter of state law not reviewable in federal habeas. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

than if Rhodes had been on the outside recounting a barroom conversation with Villa about his firing into a populated car. No Bruton severance or dual jury procedure was necessary.

Petitioner's second basis for claiming a need for severance was that evidence regarding Villa's prior shooting at vehicles unduly prejudiced petitioner against whom no such prior misconduct was introduced. However, this claim fails upon recognizing that no U.S. Supreme Court case declares that such introduction of a co-defendant's misdeeds requires severance as a matter of constitutional law, see, e.g., Hedlund v. Ryan, 854 F.3d 557, 571 (9th Cir. 2017) (antagonistic defenses); Runningeagle v. Ryan, 686 F.3d 758, 776-77 (9th Cir. 2012) (antagonistic defenses); Collins v. Runnels, 603 F.3d 1127, 1132 (9th Cir. 2010). Moreover, the possibility of prejudice is minimal here because the jury was expressly instructed that such evidence applied *only* to defendant Villa.

> This next witness, Miss Calvert, and also I believe a police officer after this witness, are going to be testifying to you an issue that is limited to one defendant only.
>
> Okay. These next two witnesses may not be considered against Defendant Almeda in any way. It can only be considered against Mr. Villa, and only if the following jury instruction is considered. Okay. So I'm going to read that to you now.
>
> The People are presenting evidence that Defendant Villa committed the offense of shooting a firearm at an occupied vehicle that is not charged in this case.
>
> You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offense.

ECF No. 13-6 at 297.

Petitioner contends that evidence against Villa for another shooting was introduced into evidence, without objection or limiting instruction, but it could be concluded without doubt that the jury understood that Villa's misdeeds were Villa's misdeeds and not those of petitioner.

Accordingly, this claim should be denied.

3. <u>The Trial Court Erred in Denying a Voluntary Manslaughter Instruction</u>

Respondent does not question the fact that petitioner, through argument, indirectly requested an instruction on voluntary manslaughter. However, as the Court of Appeal found

below in the unpublished part of its opinion, voluntary manslaughter, in this purposeful shooting into a car, was a longshot.

> Due process requires that criminal prosecutions "comport with prevailing notions of fundamental fairness" and that "criminal defendants be afforded a meaningful opportunity to present a complete defense." *Trombetta*, 467 U.S. at 485, 104 S.Ct. 2528. When habeas is sought under 28 U.S.C. § 2254, "[f]ailure to instruct on the defense theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable." ,*mglee v. Woodford*, 358 F.3d 560, 577 (9th Cir.2004) (as amended); *see also Bradley v. Duncan,* 315 F.3d 1091, 1098 (9th Cir.2002) ("[T]he right to present a defense would be empty if it did not entail the further right to an instruction that allowed the jury to consider the defense.") (internal quotation marks omitted); *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir.2000) (as amended) ("It is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case."). A habeas petitioner must show that the alleged instructional error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citation omitted); see also *Beardslee*, 358 F.3d at 578.

Clark v. Brown, 450 F.3d 898, 904-905 (9th Cir. 2006).

"A substantial and injurious effect means a reasonable probability that the jury would have arrived at a different verdict had the instruction been given." Byrd v. Lewis, 566 F.3d 855, 860 (9th Cir.2009) (internal citation omitted).   In assessing the probability that the jury would have changed its verdict, "we consider: (1) the weight of evidence that contradicts the defense; and (2) whether the defense could have completely absolved the defendant of the charge." Id. (citing Beardslee, 358 F.3d at 578).

The California Court of Appeal found in the unpublished part of its opinion the following:

*Instructing on Lesser Included Offense*

> The trial court denied Villa's request to instruct the jury on voluntary manslaughter heat of passion and imperfect self-defense. Villa contends the court erred, asserting evidence of the lesser offense was substantial enough to merit consideration by the jury. He claims there was evidence a bottle was thrown at Almeda's car, making a loud noise. Believing he was being fired upon, Villa fired back in the heat of passion and in imperfect self-defense. Almeda joins in the argument. We conclude the trial court did not err. There was insufficient evidence to justify instructing on either theory.
>
> "In criminal cases, even absent a request, a trial court must

instruct on the general principles of law relevant to the issues the evidence raises. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) ' "That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]" ' (Ibid.) '[T]he existence of "any evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.]' (*Id.* at p. 162.)" (*People v. Taylor* (2010) 48 Cal.4th 574, 623, original italics.)

Heat of passion voluntary manslaughter has an objective component and a subjective component. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) To satisfy the objective component, " ' "this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances," because "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man." [Citation.]' [Citations.]" (Ibid.)

To satisfy the subjective component, the evidence must show the defendant actually, subjectively, killed under the heat of passion. (*People v. Manriquez, supra,* 37 Cal.4th at p. 584.)

There is insufficient evidence Villa objectively and subjectively killed in the heat of passion. The evidence of provocation—a beer bottle thrown at Almeda's car—would not naturally arouse an ordinarily reasonable person to shoot and kill the person who threw the bottle. Moreover, whatever feelings Villa experienced transformed to a premeditated and deliberate intent to kill when, after he jammed his gun, he had the presence of mind to clear the jam, direct Almeda to drive up again onto Chavez's pickup, and resume shooting. Villa's conduct did not support an instruction on heat of passion involuntary manslaughter.

For the same reasons, the evidence was insufficient to support instructing the jury on imperfect self-defense for Villa. Imperfect self-defense requires " '[a]n honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 883.) The doctrine "is 'narrow' and will apply only when the defendant has an actual belief in the need for self-defense and only when the defendant fears immediate harm that ' " 'must be instantly dealt with.' " ' [Citation.]" (Ibid., original italics.)

There is no substantial evidence from which the jury could have concluded Villa killed Chavez due to an honest but unreasonable belief he needed to defend himself instantly from an imminent threat to his life. There is no evidence that after Villa's

14

> gun jammed, Chavez or Jones made any threat against the defendants. Indeed, it appears Chavez pushed and held Jones down while he tried to get away and save himself and Jones, as his Suburban began moving forward away from defendants. Yet, without any threat against him, Villa ordered Almeda to pull up a second time on the Suburban and again fired into the vehicle, this time fatally wounding Chavez.
>
> The evidence is also insufficient to support a voluntary manslaughter instruction for Almeda. There is no evidence Almeda heard the bottle break or saw or heard anything that would threaten him with death or bodily harm. The Suburban was pulling away, but he pulled up again on the Suburban, and only on Villa's command, and he did not begin shooting until after Villa had fired a second volley of shots, Villa's gun jammed a second time, and Villa directed him to shoot at Chavez. There is no evidence suggesting Almeda at that point objectively acted in the heat of passion or in an honest but unreasonable belief he needed to act instantly to preserve his life.
>
> In short, no evidence indicates either defendant acted in any state of mind after Villa's first round of shots other than with a premeditated and deliberate intent to kill willfully and with malice. The trial court did not err when it refused to instruct on voluntary manslaughter.

ECF No. 13-18 26-28.

Petitioner presents nothing in this habeas petition that he did not present to the Court of Appeal in his opening and reply brief. See ECF Nos. 13-14 at 66-70; 13-16 at 6-9. Petitioner pressed this argument on appeal because it was at least a chance to avoid the full weight of a first degree murder conviction. However, petitioner seems to forget that his primary defense was an alibi—he was not there at the time of the shooting. This was his testimony at trial, see ECF Nos. 13-9 at 1760-1778; 13-10 at 46-124. It was also the testimony of the other witnesses' petitioner presented.  The defense did not present a factual presentation that petitioner was in the car which fired on the decedent and passenger, and was provoked into the actions which were set forth in the Court of Appeal opinion.  His counsel's penultimate exhortation to the jury was that his client "was somewhere else." ECF No. 13-11 at 2297.  Petitioner grasps at straws in claiming that the failure to give a voluntary manslaughter or imperfect self-defense instruction, which would have required at least *some* indication by the defense that petitioner was indeed the person who drove the attack vehicle, and engaged in shooting, severely prejudiced him.  Habeas corpus is a

////

mechanism for righting miscarriages of justice; it is not a mechanism for after-the-fact contrived, "believe me now" arguments.

Petitioner testified at trial—and the jury must have found, despite the non-defense presented/argued evidence upon which petitioner now relies, was inconsequential in arriving at the guilty verdict on premeditated murder. There was certainly very substantial evidence to support that verdict.

In reviewing the factual arguments, the absolute best that could be said on petitioner's behalf is that reasonable jurists might take different positions about whether due process required the giving of the requested instruction. However, it cannot be said that reasonable jurists could not find, as did the jurists on the Court of Appeal, that there was no basis for the voluntary manslaughter/imperfect defense instruction. Count the undersigned as a jurist who agreed with the Court of Appeal. The factual and legal analysis by the Court of Appeal was a fair assessment. AEDPA requires more of petitioner.  Accordingly, this claim should be denied.

    4.   Ineffective Assistance of Counsel for Failure to Argue the Introduction of False Testimony

Petitioner brings this claim asserting that his appellate counsel should have argued that "false testimony" was given by the passenger in the decedent's vehicle and the jailhouse informant.  As noted by respondent, citing United States v. Zuno-Acre, 44 F.3d 1420, 1423 (9th Cir. 1995) and United States v. Croft, 124 F.3d 1109, 1119 (9th Cir. 1997), petitioner makes the mistake of many petitioners in asserting that evidence which might be considered disputed by other evidence, or inconsistent with previous statements of a witness, renders the former evidence/testimony necessarily "false."  See ECF No. 4 at 39-74, 91-147 (presenting voluminous claims of false testimony by virtue of inconsistency with trial evidence).  Moreover, this claim of "false testimony," even if there could be a sufficient factual basis for claiming such, would not be permitted on appeal because the claim would have to inevitably be based on extra-record evidence not appropriate to be raised on appeal. The record evidence does not establish whose testimony was correct or incorrect except, importantly, insofar as the jury found against petitioner.

This claim against appellate counsel was brought in a series of habeas corpus actions filed in state court. The Superior Court rendered the only explained decision:

> Petitioner, however, relies solely on pretrial statements that were available to the defense at the time of trial and trial testimony. He fails to present any new evidence to show that the witnesses in fact testified falsely. Mere inconsistencies between a witness's testimony and the witness's prior statements do not prove the falsity of the testimony; rather, it is unknown whether the witness lied in the testimony or lied in the prior statement (People v. Vines, (2011) 51 Cal. 4th 830, 875). As such the claim fails and is denied.

ECF No. 13-21 at 1.[4]

Petitioner, citing law dictionaries and California cases of dubious applicability, claims that that state law does not require that the prosecution knew of the false testimony, and as long as the testimony was 'not genuine," ECF No. 4 at 59, and asserts that he had a genuine issue that should have been raised by appellate counsel. However, it is not the province of a federal court sitting in habeas jurisdiction to harmonize state law (assuming for the moment that it is inconsistent), or to find that the Superior Court "got it wrong" when assessing petitioner's claim under state law. See supra note 3. Thus, petitioner's ineffective assistance of counsel claim cannot be found meritorious as far as state law is concerned.

Turning to any federal issue presented, it is beyond dispute that a prosecutor may not knowingly inject false information into a trial. Napue v. People of State of Ill., 360 U.S. 264, 269 (1959); Dow v. Virga, 729 F.3d 1041, 1043 (9th Cir. 2013). Even in situations where the prosecution is surprised by the introduction of false evidence, a duty on the part of the prosecution arises to correct the mis-information. Id. This duty applies only to the prosecution—the defense does not have an equivalent duty. Sivah v. Hardison, 658 F.3d 898, 909 (9th Cir. 2011). However, in order to establish a Napue claim, the testimony/evidence presented at trial must be actually false. Reis-Campos v. Biter, 832 F.3d 968, 976 (9th Cir. 2016). Moreover, just as in the state and federal law cited above, the fact that the prosecution introduces evidence which might have been inconsistently set forth does not establish a Napue violation; the mere fact of

---

[4] The same claim was summarily denied by the Court of Appeal and California Supreme Court. ECF Nos. 13-23; 13-25.

inconsistency is for the jury to resolve.  United States v. Geston, 299 F.3d 1130, 1135 (9th Cir. 2002).  If the rule were otherwise, every time a witness recants statements to the police, or changes previous statements in any way, no criminal prosecution could continue.  Not many criminal cases could ever find their way into court.

Petitioner filters the Napue claim through ineffective assistance of appellate counsel. Thus, petitioner must show that known-to-the-prosecution "actually" false evidence was presented by the prosecution, that the appellate counsel was unreasonable in failing to argue such, see Jones v. Barnes, 463 U.S. 745, 753 (1983), and that no reasonable jurist would find otherwise—a highly deferential standard. Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).

Petitioner does not get to first base with this claim. Again, by simply comparing trial evidence with pretrial statements and evidence, he goes no distance in showing that the testimony/evidence at trial was "actually false."  Rather, the inconsistencies were highlighted in cross-examination and final argument.  These inconsistencies were up to the jury to resolve. Moreover, petitioner does not reach the extra base of demonstrating no reasonable appellate counsel would have debated that the evidence had been shown to be false, i.e., perjurious, fabricated, or the like, and that the Superior Court was AEDPA unreasonable in finding to the contrary.

Finally, even if this court were to get to the prejudice component of ineffective assistance of appellate counsel, the undersigned could not find that petitioner proved Strickland prejudice. Petitioner defense was an alibi defense—he was not present when the shooting from the car occurred.  The jury's primary focus would be on the legitimacy of such a defense.  While it may be true, the less believable the eyewitnesses the more believable the alibi defense, simply arguing *on appeal* that the jury got it wrong in rejecting the alibi defense would do little in determining whether the result on appeal would have been different.  Petitioner does not argue that the evidence to convict him was insufficient—his appellate counsel arguing the facts would be akin to arguing a fruitless evidence insufficiency based on conflicting testimony—an argument which

////

////

would not have changed the result of the appeal. The California courts' habeas decisions would not be AEDPA unreasonable in determining a lack of prejudice. This claim should be denied.

     5. <u>Cumulative Error</u>

There has been no error found and therefore there is no error to accumulate. This claim should also be denied.

*Conclusion*

Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has not been made in this case.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Petitioner's First Amended Petition should be denied in its entirety and dismissed; and

2. The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: January 4, 2021

                <u>/s/ Gregory G. Hollows</u>
                UNITED STATES MAGISTRATE JUDGE